Good morning. It pleases the Court, and it's right on behalf of Appellant Sheryl McDade. Your Honor, we are here to examine two issues that were determined at the court below. The first one is, can the plaintiff make out a prima facie case of pregnancy discrimination, given the facts that had been presented to the court below, specifically that within three days of asking for personal time off with a rather sizable accrued leave, Ms. McDade was told that her position was being relocated across country from Reno to Washington, D.C., and it was either move or be fired. This announcement that she needed time off was also accompanied by the information that she was in a high-risk pregnancy, that she was carrying twins, and based on her age and her condition, that she would have to be taking a sizable amount of time off. The second issue is, Ms. McDade was denied her day in court by the court below, simply by making findings that could directly be construed as findings of credibility. What we are asking the court to do today is to remand this case to the district court so Ms. McDade can have her day in court that would be decided by a jury of her peers and not by the judge. They would issue the summary judgment ruling. We believe that the district court erroneously held that there were no material issues and disputes in this particular case. We have cited several in our brief. First of all, Mr. Paul Lumley, who was her direct supervisor, had originally told her that she was going to be laid off as part of the general layoffs that were taking place at the company where she was employed. When she said, okay, Mr. Lumley, that's fine. What do you want me to do with these grant applications and other fundraising instruments that I've been put in charge of? He said, wait a minute, I didn't know that. With that in mind, we're going to delay your layoff and keep you on board. In doing that, he was able to keep the cash flow coming in. Three days after June 18th is when the announcement came that she would have to move to D.C. That would mean that she would be going through her final trimester during the most sensitive period of her pregnancy, away from home, away from family, and really when there had been no need for her to be transferred. Counsel, in my view, the most crucial piece of evidence regarding this issue would be the minutes of the meeting where it was asserted that this decision was made prior to knowledge of the pregnancy. What's your response to those meeting minutes? Very good question. Thank you. It is our position that those were complete fabrication. I inherited this case after Ms. McDade had been handling it on her own. But she had asked for the tapes of that meeting. We never got them. She never got them. And we weren't allowed to go back and get more discovery to make the NAICHC produce them. So the minutes that we did get were typed up roughly a month after the meeting took place. I'm sorry, Your Honor? Typed up a month after what? After the meeting had taken place, Your Honor. So would that be unusual? We believe it would be, Your Honor. Do you have any evidence that that was not the practice of the agency, of a cash-strapped agency? How often does this group meet? That I don't know, Your Honor. It had been shifting. They were meeting quarterly at one point, yes, Your Honor. So if you're typing up minutes, sometimes they just contain action items. Sometimes they're only a reflection of things that are going on that only need to be prepared in anticipation of your next meeting. Certainly. It's not unusual for the committee meetings, at least that I've been a part of, to not get the minutes until just before the next meeting. No, I would agree with that. So what evidence do you have that it's fabrication? Those are pretty strong terms, pretty value-laden. And as far as I can see in the record, I don't think you've got any evidence. I think you have to look at the case taken as a whole to look at the pretext. If you would have a very strong case for pretext, if you could show there was fabrication. We never had that opportunity to get that far. We weren't allowed to go back and do what I would consider a more thorough process of discovery. We were denied that opportunity. But what do we do with that? Because we, just like you, we're stuck with the record that was made before the district court. So what do we do with that? If we have these minutes that are unrefuted and just an allegation of fabrication but no evidence supporting that, what do we do with that? I think we need to look at the motives of the party, the timing of all the events, and look at the pretext. Before you answer that, if I may, just one further question about these minutes. I read them, but assuming for the moment that they're real, all right, or assuming that they're not fabricated, do those minutes actually show that there was any discussion or approval of moving the job, or is it just, do they just show merely a suggestion by Lumley that the plaintiff's position be moved? Thank you, Your Honor. That was exactly going to be my answer. There's one line in each of them that doesn't fit if you look at it with the flow of the rest of it. There is no discussion. It's consistent, at least, even if it's just a suggestion. It's still consistent with the moving the position to Washington. It's not as if it were made up after the pregnancy. If we credit the minutes, this idea was brewing before the pregnancy was known. The purported discussion of the relocation that was to have taken place allegedly at the April 2007 board meeting was one sentence, Your Honor, and that is the board was advised that developing a diversified advisory board and implementing a diversified fundraising plan will require relocating the fundraising position back to Washington, D.C. This does not mean that a discussion took place, nor that a decision was made to relocate the fundraising position. There was also another place in the official record where Mr. Lumley claims there was a rationale for relocation was being made to D.C. because it was important for the fundraising efforts to take place there. Yet there was never a mention to Ms. McDade on the day she was being terminated, and he quashed that. He never said anything about, well, you'll have to move to Washington, D.C. then. It didn't come up to her until after the May 20th announcement that she was having twins and that there may be some problems because it was going to be a high-risk pregnancy. But even then, she offered a position in Washington, and she was previously told that she was going to lose her position. So, I mean, in some respects, she's lucky that she didn't get fired back in February or March when everybody else got terminated because they lost their funding. She keeps her position for a little bit longer. They then offer her the position and say, look, we're going to have to move this. We're going to have to consolidate offices. We're going to move this to Washington, D.C., to headquarters, and we're offering you the position. That doesn't exactly sound like discrimination on the basis of pregnancy. I agree. When summarized like that, it probably doesn't. But why doesn't it get brought up before when she says, what do you want me to do with these grant applications? There was no mention of it then. There was no mention of it until she says that she's pregnant, she's going to need some time off, and within three days, she has to move. Well, it's a month later, and again, they've offered her the position. They took away her benefits as well, Your Honor. And I think that's an important thing. It's clear that this is an organization that is in extremis. I'm sorry, is what, Your Honor? They're in a very extreme position. They're lucky that they're keeping their doors open at all and had to terminate half the staff. She was lucky she didn't get terminated the first time with everybody else long before she was pregnant. That's the point exactly. They kept her on to keep the fundraising going. When she said, I'm going to need time off, they said, okay, that's it, you're gone. Now, how did they do this? They said, you've got to move to D.C. Knowing that for her to move to D.C. would create an immense hardship on her. The only reason our position that she was being moved to D.C. is because she was pregnant, she was going to be out of the fundraising loop, she wouldn't have been able to earn any more money for the company. And therefore, her value to the company, based on her pregnancy taking her out, is why they terminated her. But wait, are you saying that they decided to move the job to Washington in order to get her out of it? Knowing, Your Honor, that she could not make that move, yes. Yes. The answer is yes. Yes. All right, so you're not saying that they never intended to move it and they just said that. No, correct, Your Honor. Okay. And looking at the timing is very important here. This comes three days after she asked for time off. Now, why no mention of it to her up until then, if indeed it was being talked about in April? Why doesn't she hear about it until three days after she says, I am going to need time off and I won't be able to do the fundraising and I'm going to be out? No mention of it to her at all until then? Pardon me, Your Honors, for a colloquialism, but to me that doesn't pass the smell test. There is something contrived about that that just simply smacks of insincerity on their motive here. She was not going to be able to continue to do the fundraising and, therefore, they put her in a position that was completely untenable for her because she was pregnant, period. Am I right? Are you asserting that the defendant didn't tell your client about this location change until two months after it was allegedly decided in April? Is that what you're saying? I'm saying quite specifically that they didn't tell her about it until three days after she said, I'm going to need time off. That too, but that's the first. There was no mention of it to my client prior to that time, Your Honor. That was two months after the alleged decision was made. Is that right? You are correct, Your Honor. Two months after the so-called April meeting, and it was only three days after she requested her medical leave. Is that right? That is correct, Your Honor. There was a question that was asked in a previous case by Judge Rawlinson. What was the comments that were so adverse and so offensive? Upon announcing at the convention that Ms. McDade had substantially helped to put together on May 20th, she was running a little late to the convention, and she came in, and Mr. Lumley was there and greeted her quite warmly, and she said, oh, well, I just found out that I am pregnant, and I am pregnant with twins. His entire attitude changed in the snap of the fingers, and his remark then was, then why did you even bother to come? Intonation added. I hope accurately. Yes, intonation added, but the way it was relayed to me, I hope it was accurate. I would like to reserve some time for rebuttal. I see I am short.  Yes, please. Thank you, Your Honor. We'll hear from the defense. Good morning, Your Honor. Paul Tremmer of Jackson Lewis on behalf of the Pele National American Indian Housing Council. I'll jump right into it. The issue here clearly, the case clearly revolves around these minutes and the declaration testimony of J. Paul Lumley, who was the executive director of the organization at the time that Ms. McDade was discharged. In early 2007, National American Indian Housing Council, which is a not-for-profit company, lost virtually all of its HUD funding. It had to lay off. It ended up laying off, by the end of the year, more than 66 percent of its staff. After the layoff, or after the loss of funding, which is the day that Mr. Lumley was hired, emergency meetings began being scheduled with the board of directors. This is in February. And at that time, the organization decided it needed to revamp its fundraising efforts. It depended too heavily on federal HUD funding. It needed to cast its net wider and bring in any other sources of revenue. In April, when Mr. Lumley met with the board of directors again, it was decided that the fundraising position would be relocated from a field office, where Ms. McDade was located in Reno, moved to Washington, D.C., because that would put her in touch with the people who had access to more money, who could better fund the organization. This is the national fundraising effort throughout Reno? Well, Ms. McDade was one of the few people that was involved in drafting grant applications. The fundraising coordinator position had been vacant for some time, because she was continuing to draft those grant applications. Instead of laying her off in the initial reduction in force, Mr. Lumley let her take over the fundraising position. There was a formal fundraising position, was that out of Washington or was it out of Reno? It was out of Washington originally, but it had been vacant for some time. So were there grant writing efforts locally and nationally? I know that the way it was organized, there were these employees like Ms. McDade who were responsible for geographic regions and groups of Indian tribes. And they were involved in the grant writing application process. There was also grant writing taking place. Just so I understand, so the grant writing she did would have been for the Reno area only? I don't know the answer to that. You don't know? So on April 17th, as demonstrated in the minutes, and the minutes are signed under penalty of perjury by two individuals, Mr. Lumley and the director of the board. Mr. Lumley also, in his declaration, which was uncontroverted, said this is when we made the decision to relocate the position. And then after April 18th, it took some time. By June, they decided to formalize the decision to relocate the position. They offered that job to Ms. McDade. She declined the relocation. And she also declined an additional contracting position that would have allowed her to remain employed, although she would lose her benefits because it was a contract position. Do you know if those meetings were taped, recorded? They were taped, but the tapes are no longer available. Were they available when requested, when they were requested? And I'd like to address that. The plaintiff was not precluded from taking any discovery in this case. She wasn't precluded from taking discovery by the schedule, and she wasn't precluded from taking discovery by a lack of knowledge or by any efforts to prevent any efforts on defendant's part. But she was representing herself at that point. She was, but she hired an attorney, I believe, in January, and the discovery cutoff was later on that spring in April. There were several months to do that. More importantly, the critical issue, the critical claims that these minutes are fabricated and that Mr. Lumley is lying when he says, I decided to terminate her well before she disclosed her pregnancy to me. But Ms. McDade never deposed Mr. Lumley, and although she identified witnesses who could supposedly support her claim that the minutes were fabricated as early as her EEOC charging papers, she never obtained declarations from them. She never subpoenaed them. She never deposed them. She knew exactly who these people were, and there's no explanation for why she didn't provide this evidence to challenge the appellee's position that she was discharged because the position had to be relocated. Now, it's important to note that, again, not only was the relocation decision, did it begin in February in a time of immense financial distress, it was carried out after another decision was made by the board of directors in April. It was carried out at the end. Once the position was relocated to Washington, D.C., the organization didn't fill the position. It didn't fill it with a non-pregnant person. It didn't fill it with anyone in particular. The role was absorbed by the executive director, Mr. Lumley, because the company didn't have the funds to hire somebody. That is, again, an undisputed fact. And it remains the province of the executive director to this day. They've never restored that position. They've never had funding to restore that position. So there's no way for Ms. McDade to prove that she was discriminated against because a similarly situated person that was not pregnant was treated better than she was. The position that Appellant has also argued is that somehow stripping her of this position and forcing her to make a decision about relocation at the time when she was pregnant was unfair and that it somehow prejudiced her or could constitute discrimination. But the Pregnancy Discrimination Act clearly doesn't require an employer to subsidize an employee to grant extraordinary financial concessions to an employee when they're trying to carry out a business decision. It's unfortunate and regrettable how this took place. It's unfortunate that NAIHC lost virtually all of its funding. It's unfortunate that Ms. McDade was asked to relocate to Washington, D.C. But the Pregnancy Discrimination Act doesn't require the company to increase Ms. McDade's compensation or in order to facilitate her transfer. And it's also undisputed in the record that Ms. McDade didn't just decline the position. She also asked to travel back and forth from Reno to Washington, D.C. for an indeterminate period of time. That would be far more expensive than even just paying for the relocation. NAIHC wasn't obligated to do that under Title VII or the Pregnancy Discrimination Act. In sum, there's nothing about this case other than Ms. McDade's suspicion. She suspects that the minutes were fabricated, but there's no evidence of that other than her own speculation. She has no – there's no foundation for her to believe that. She has no personal knowledge to suspect that the minutes were fabricated. She's never produced a single document that would suggest that the minutes were fabricated. Well, leaving that out of the case for the moment, what about these circumstances that seem to indicate a temporal connection between certain information breaching the company and this decision? Well, are you speaking to the June 18th and June 21st dates that was referenced by you, Tom? First, I would note that the record doesn't say that Ms. McDade asked to go on extended medical leave. I'm sorry. Ms. McDade did not ask to go on extended medical leave at that time. She asked to take leave to go to see a doctor for a single visit. That's a far different situation than the one described by Appellant in his opening argument. Also, the way the business is organized, it's a not-for-profit that takes – at that point, they were meeting more than quarterly because of the financial problems that the organization is having, but it takes time to carry out those decisions. It took time to put the fundraising strategy into place. There was a lot of different things that happened at that time, not only relocating the position but also identifying other sources of income and trying to branch beyond strictly federal income. And they were looking at other private organizations, private not-for-profit companies that give grants to organizations like NEIC. So what's the explanation for the two-month delay in telling her about the location change and the decision to make the location change? Well, the explanation is that it just took that long for the company to finalize its decision. So it hadn't made the decision? No, it had made the decision on April 18th to relocate the position. The timing of it was when that was going to happen. It had to happen soon. It just took a little while to put it into place. It was only about a month after the company was told she was pregnant, is that right? That's correct. So essentially it seems that what we have here is a case of sort of rise and fall on the sufficiency of this temporal connection. Well, that's the only evidence that Ms. McGage has proffered. There's no indication of a fabrication here. It's just an assertion. That's correct. And given that they offered to give her the position, although the relocation would have been difficult on her, the fact that they offered her the job really undermines the claim that they were trying to get rid of her. It's also sort of an extravagant theory, if I may say so, that they would make this important kind of decision just to deflect this woman away from this job. I guess it would have to be made on the assumption that she wasn't going to take it because of the high-risk pregnancy. I mean, it's a kind of a contraption. I mean, it's a construction that's difficult to make, I think, to prove. That's correct, Your Honor. It's on its face, I think. That's correct. And the organization gave her time to make this decision. It didn't give her a lot of time, but it gave her time to consider it, to make a decision about whether she wanted to move. It gave her several weeks, and Mr. Lumley met with her in person to try to convince her to come to Washington, D.C., and take the position. He met with her at her house, and she declined. And with that, unless Your Honors have any further questions, we request that you affirm the district court's decision. All right. Thank you, Counsel. Rebuttal. Thank you, Your Honor. I first need to correct myself as to one of my assertions. The minutes from the April meeting were not transcribed until September of 2007, which was after the announcement that Ms. McDade was pregnant. I also wanted to address one of the assertions just made, that the director was the only person who was doing fundraising and remains so as his sole province today. That is not correct. As a matter of fact, his domestic partner was brought on, Philip Hilaire, and took over some of those responsibilities as well. So it wasn't as extravagant a theory as perhaps we could surmise, seeing that not only was she pushed out, but someone who was significant to the director in a relationship that could be analogized to a marital relationship was brought on to take over some of those responsibilities. And as to meeting with Ms. McDade in her home in Reno to try to convince her to come to D.C., that meeting took place prior to the June 18th announcement that in her third trimester she was going to need time off, and no mention, none, was made of moving to Washington, D.C. Now, we have cited in our brief several different cases that suggest perhaps extravagant theories have been brought out. Circumstantial evidence, I think, is highly important in this particular case because under the circumstances that we are showing,  I rely on Wallace v. Simplot out of this very Ninth Circuit, a 1994 case in my brief, that talks about a reduction in force case very much akin to this, and yet those circumstances were found to weigh in favor of the plaintiff in their circumstantial nature. So while taken on an individual basis, perhaps, but when broken down as a whole, it cannot be denied that there is more than a coincidence here. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court, and we will be in recess for 10 minutes.
judges: Arnold, Rawlinson, Bybee